UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
AUG 1 5 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) No. 04 CR 699
) Judge John F. Keenan
GALE NETTLES )

## GOVERNMENT'S MOTION IN LIMINE
## TO EXCLUDE AN ENTRAPMENT DEFENSE

The United States of America, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully moves the Court, *in limine*, to exclude an entrapment defense absent defendant filing a sufficient pre-trial evidentiary proffer of facts to support such a defense. Alternatively, if this Court is inclined to allow defendant to argue that he was entrapped, the government asks the Court to allow the admission of defendants' convictions that are relevant to the issue of whether he has a predisposition to commit the crimes charged in the indictment.

## INTRODUCTION

I.   **Facts**

A.   **Defendant's Discusses with Inmate the Idea of Bombing the Dirksen Federal Building**

On September 5, 2002, defendant was sentenced to a term of imprisonment of 24 months after being convicted of manufacturing counterfeit U.S. currency using a home computer and equipment. As a result, defendant was incarcerated at the Federal Correctional Institute ("FCI") in Yazoo City, Mississippi. According to another convicted felon ("CW1") serving time at the FCI in August 2003, defendant asked him about ammonium nitrate in August 2003. Along with its use in farming, ammonium nitrate can be combined with other materials to create a powerful explosive

device. According to CW1, defendant said that he was familiar with the Chicago federal courthouse and that he could easily load a truck with ammonium nitrate and place it in the loading dock area of the courthouse. CW1 stated that defendant sketched the courthouse in sand in the exercise yard when describing it.

CW1 informed the FBI of defendant's statements. The FBI provided CW1 with a telephone number of an undercover FBI telephone. The FBI told CW1 to give the undercover telephone number to defendant and to tell him that it was the number of an individual who could purportedly help defendant obtain ammonium nitrate.

**B.      Defendant Contacts FBI Undercover Telephone and Makes Contact with UC1**

On October 27, 2003, defendant traveled to the Salvation Army work release center in Chicago to complete his term of imprisonment. While at the Salvation Army, defendant regained possession of his cellular phone. Shortly thereafter, defendant's cellular telephone number appeared on a Caller ID device connected to the FBI undercover phone on three dates in November. On November 25, 2003, an FBI Special Agent acting undercover called defendant and said that he saw his number on his Caller ID. Later, the FBI Special Agent offered to have his "bossman" call defendant. Defendant told the agent to have him (the "bossman") call defendant's cell phone and that defendant has been using the nickname "Ben Laden."

On December 1, 2003, a Joint Terrorism Task Force law enforcement officer who was acting undercover ("UC1") called defendant in response to defendant's call to the undercover phone. When UC1 asked defendant what he could do for defendant, defendant replied that maybe CW1 could explain it to him. UC1 said he spoke to CW1 and knows what defendant wants. UC1 told defendant that he could sell it to defendant for a little more than he paid for it. Defendant said he would be

2

released on December 26, 2003, and then would need to get organized. Defendant said he would call back sometime in January.

Defendant was released from the Salvation Army facility on December 26, 2003. On January 7, 2004, CW1 spoke to defendant using a cellular phone given to him by law enforcement. CW1 told defendant that UC1 would be coming to Chicago in the next few weeks. CW1 asked defendant if he remembered what they had talked about, and defendant said yes. CW1 asked defendant if he was still serious. Defendant stated that he was very serious. CW1 asked defendant if he wanted UC1 to come by and see him or call him when UC1 was in the area. Defendant told CW1 to tell UC1 to call defendant when UC1 was in the area. Defendant said he was going to get his computer from his attorney later in the week.

## C.  Defendant and UC1 Meet in Chicago

On January 13, 2004, UC1 called defendant. UC1 and defendant agreed to meet the following day. On January 14, 2004, UC1 and defendant did having a meeting, which was recorded. Defendant told UC1 that he was trying to get his computer back from his attorney. Defendant stated he that he was into "graphic arts" and was going to make money the "old fashioned way . . . as in printing it." Defendant told UC1 later in this meeting that he was waiting to get his computer up to get "some money rolling." Defendant asked UC1 if he "could use some bogus money" and that he sold the counterfeit money at a rate of "twenty, thirty percent depending on how good it is." Defendant said "passing it (counterfeit money) is something like passing a bad check."

In that same meeting, defendant stated that the federal courthouse downtown "is blocking the view of the lake." Defendant claimed that he wanted to "collapse the building." Defendant said he has a problem with the whole federal system, including the judge on his counterfeiting case.

3

Defendant explained to UC1 his understanding of the procedure for using ammonium nitrate in a truck bomb. UC1 asked defendant how much defendant wanted. Defendant asked in response if a semi-trailer holds 20,000 pounds. UC1 stated that he was not sure if a semi-trailer full of ammonium nitrate could be set off. UC1 explained that perhaps drums of ammonium nitrate would be better to set off. Defendant explained how he would set off the explosives. UC1 stated during the conversation that about 1,200 pounds would make the statement defendant wants. Defendant responded by stating that he wants to take out "a couple of city blocks."

During this conversation UC1 asked defendant if defendant could get his hands on something to set the fertilizer off. Defendant stated he had a contact in Tennessee who has some dynamite. UC1 asked him about storage for the ammonium nitrate. Defendant said that storage around him was expensive but that he knows someone who may be able to help him store it.

### D.     Defendant Obtains Computers to Manufacture Counterfeit Bills

On January 26, 2004, law enforcement saw defendant moving a computer printer and several boxes into the hotel where he resided at 1124 W. Wilson Avenue in Chicago. Also that day, UC1 contacted defendant and asked him if he got his other operation up and running yet (referring to counterfeiting money). Defendant said no. Defendant told UC1 he got some of his computer equipment back and that he still needed to get his main computer back.

On January 29, 2004, law enforcement observed defendant ride in a van to the address where the attorney who represented him in his federal counterfeiting prosecution worked. Surveillance later observed defendant exit the van outside his residence with a computer central processing unit. On January 31, 2004, law enforcement surveillance revealed that defendant obtained a central processing unit from a Salvation Army store.

On February 12, 2004, UC1 called defendant, who said that he was still having problems getting storage space, but was getting his computer set up. Defendant stated that he still did not have a printer for his room. UC1 asked defendant if UC1 heard correctly that defendant was still trying to get a storage space set up. Defendant replied: "Yeah, I'm still working on that definitely." Defendant described how he had most of his computer equipment together, but he still had not produced any "product" yet. UC1 stated that he has a friend interested in some of it when defendant got up and going. Defendant described to UC1 how he had three computers. According to defendant, one was old and inoperable, one had an inoperable hard drive and the third, a Packard, had a new hard drive, a new CD Rom and new software. Defendant indicated that he needed a good printer. Defendant told UC1 that as soon "as I get something up where I can start" he would definitely call UC1.

### E.    UC1 Sends Printer and Software to Defendant

On February 17, 2004, UC1 called defendant. UC1 asked if defendant had his computer up yet. Defendant replied that he had to come up with some new software, specifically Adobe Photo Shop Version 4 or 5, with Microsoft Photo Editor, and a new printer. Defendant also told UC1 that he needed a laser jet printer, 1200 dpi, color perfect.

UC1 said that he may know where he can get some computer software and hardware. Defendant advised that he needed an original Photo Shop since a counterfeit copy would not install on his computer. Defendant described his computer system as having Windows 2000 Professional loaded as the operating system, a 4-gigabyte hard drive, a 333 Pentium II processor, and 64-megabytes of memory, and a scanner. UC1 specifically asked Defendant if he uses a digital picture or a scanner for his "product" or "the cash flow." Defendant replied that he uses a scanner.

5

On February 25, 2004, defendant received a call from UC1. UC1 asked how his computer was going. Defendant advised that he was fine-tuning it and installing a CD-RW drive onto it. Defendant indicated that he still did not have a printer. UC1 advised defendant that he had a brand-new printer and Adobe Photo Shop software. UC1 told defendant that UC1 believed the computer equipment and software was stolen. Defendant inquired as to whether the software still had the serial numbers with it. UC1 replied that it was new in the package. Defendant told UC1 to mail it to his address. On March 7, 2004, defendant left a message for UC1 that he had received the printer.

### F.     Cooperating Witness Provides Paper to Nettles for Use in Counterfeiting

In late April 2004, a paid cooperating witness ("CW2") befriended defendant and began speaking with him on a regular basis. CW2 told defendant that CW2 has a friend who was interested in counterfeit currency. On May 5, 2004, defendant told CW2 he had the computer equipment he needed to make the money, but that he needed the paper to make it.

On May 10 and 14, 2004, CW2 showed defendant a total of five different samples of printing paper. Defendant kept some of the paper but stated he did not prefer the samples because the paper was not waterproof and was too thick. Physical surveillance and additional conversations between defendant and CW2 revealed that defendant also purchased paper himself.

### G.     Defendant Buys Scanner and Manufactures Counterfeit Currency

On May 20, 2004, defendant told CW2 he bought a new scanner. On May 22, 2004, CW2 met with defendant at a restaurant on North Broadway in Chicago. During the meeting, defendant delivered to CW2 $560 in counterfeit bills in exchange for $100 in U.S. Currency. The counterfeit bills were in denominations of twenty dollar bills and all had a serial number of CB54072514C.

Defendant and CW2 met at the same North Broadway restaurant on May 27, May 28, and July 7, 2004 to exchange counterfeit bills for U.S. currency. On May 27, defendant delivered to CW2 $1,500 in counterfeit bills in exchange for $300 in U.S. Currency. The counterfeit bills were in denominations of twenty dollar bills and all had a serial number of CL65890931C. On May 28, defendant delivered to CW2 $3,680 in counterfeit bills for a total of $700 in U.S. Currency. The counterfeit bills were all twenty dollar denomination with serial number CL86890931C. On July 7, defendant delivered $52,300 in counterfeit bills for a total of $10,000 in U.S. Currency. The counterfeit bills were all in denominations of one hundred dollars and all had a serial number of CB 83243568A. During the July 7 meeting, defendant returned $5,000 of the genuine U.S. Currency to CW2 as payment for his/her brokering the deal with the individual who purportedly provided the genuine U.S. currency and was purportedly receiving the counterfeit currency from CW2.

### H.     Defendant Sends Counterfeit Currency to UC1

On July 17, 2004, defendant left a voice mail message on UC1's telephone. Defendant said he sent him "8,800" priority mail which UC1 should receive Monday or Tuesday. On July 21, 2004, UC1 received a priority mail package containing $9,000 in counterfeit currency, all in denominations of one hundred dollar bills. On this same date, UC1 called defendant and told him he received the package. UC1 told defendant the bills looked good. Defendant said he used copy machine paper and that he can work on the detail. UC1 told defendant he was not going to have access to the fertilizer much longer as he was getting out of the farming business. UC1 told defendant that the amount of counterfeit currency that defendant sent was more than enough to pay for the fertilizer. UC1 asked defendant how much he was wanted. Defendant replied that he needed enough to set off a two-thousand pounder. In discussing storage, defendant said he would see what he could dig up.

7

I. **Defendant Asks whether CW2 Knows any Associates of Terrorist Organizations**

On July 23, 2004, defendant asked CW2 if CW2 knew anyone involved or associated with Al Qaeda or Hamas. Defendant stated that Al Qaeda took out the World Trade Center on 9/11. Later, CW2 told defendant that CW2 knew an individual who is a member of one of those groups. CW2 stated that this individual drives a limousine and a cab.

The next day, July 24, 2004, defendant executed a rental agreement to rent a 3'x4'x10' storage locker at a Public Storage facility in Chicago. Defendant had access to the locker beginning that day.

J. **Defendant Offers to Sell Ammonium Nitrate to a Purported Al Qaeda Member**

On July 25, 2004, defendant met with CW2 and the individual ("UC2") who CW2 purported to be a member of a terrorist group. UC2 was, in fact, was an undercover FBI Special Agent. After being introduced, UC2 asked defendant what defendant had. Defendant responded that he had "half a ton of ammonium nitrate." When UC2 asked defendant if he had it ready, defendant said that it was in New Orleans, but that he could make one phone call and have it in the city in two days. Defendant added that he has a target in mind: the U.S. courthouse downtown. Defendant said that half a ton could make a 3,000 pound bomb, adding that he knows how to build them and set them off.

Defendant asked the UC2 if he remembered when they took out the federal building in Oklahoma City. Defendant said that they used ammonium nitrate there. (Ammonium nitrate was, in fact, an ingredient in the bomb used in the attack on the Alfred P. Murrah federal building)

UC2 asked defendant how much he wanted for the fertilizer. Defendant responded that half a ton would be $15,000. UC2 told defendant that $10,000 was acceptable. Defendant agreed to that

8

price. Later, defendant asked UC2 if the target, the U.S. courthouse downtown, was acceptable. UC2 responded by saying that he could not tell defendant what the plans were. Defendant told UC2 that he would make a phone call and have the fertilizer brought up and put into a storage locker.

### K.     Defendant Details Plan to Bomb Dirksen Federal Building to UC2

On July 31, 2004, defendant met again with UC2. He told UC2 that he had secured a storage facility, but would have a problem making the exchange of fertilizer with UC2 at the storage facility due to its surveillance cameras. Defendant explained again that his target would be the U.S. courthouse downtown on South Dearborn Street. He also stated that there was another courthouse that handles civil matters directly across the street. He mentioned that if there was something placed between the two buildings, it would take both buildings down.

During this same meeting, defendant spoke about bringing down the building around 10:00 a.m. or 11:00 a.m. when the judges would be present. Defendant said that people pay more attention when people are injured, as opposed to when there is only physical damage to property. UC2 asked defendant about the prospect of persons not affiliated with judges being killed, and defendant explained that he sees this as a "combat strike" in which there are always friendly casualties.

Also in this meeting, defendant described in detail how to make an explosive device, including the ingredients he would use in addition to fertilizer and how the explosives should be wired for detonation. Defendant explained that the person who placed the bomb could get away quickly because of the close proximity of an expressway to the building.

### L.     Defendant Accepts Delivery of Fertilizer from UC1

On August 4, 2004, pursuant to an earlier request from defendant, UC1 drove to the storage facility defendant rented in Chicago. Defendant accepted delivery at that facility of what UC1

9

purported was ammonium nitrate fertilizer. The material was actually a different, non-dangerous type of fertilizer. Defendant took delivery of ten boxes containing fertilizer, weighing an estimated five-hundred pounds.

### M. Defendant Arranges for Fertilizer to be Delivered to UC2

Later on August 4, 2004, defendant and UC1 traveled to a park in Chicago where defendant discussed the sale of fertilizer to UC2 that defendant anticipated occurring on August 5, 2004, including specific instructions on what UC1 was supposed to do during the sale. Defendant told UC1 that UC2 would buy the fertilizer for $5,000 (rather than the true $10,000 figure) and that defendant would pay UC1 $3,000 out of the $5,000.

The next day, defendant and CW2 traveled to a park in Chicago. Pursuant to defendant's instruction, UC1 arrived separately at the park at approximately 6:00 a.m. with a pickup truck containing approximately 1,500 pounds of fertilizer. UC1 then departed the area on foot as defendant had requested. UC2 and two other law enforcement employees acting undercover and posing as his associates had arrived separately at the park. Pursuant to defendant's previous instructions, UC2 and his two associates transferred the fertilizer from UC1's pickup truck to another vehicle. Defendant walked in the park during the transfer monitoring the transfer. Defendant and CW2 then met with UC2 inside another vehicle, where defendant accepted delivery of $10,000 from UC2 as previously agreed by defendant and UC2.

## II. Indictment

The grand jury charged defendant in a nine-count indictment with: (1) one count of attempting to damage and destroy, by means of fire and an explosive, a building owned and possessed by the United States, in violation of Title 18, United States Code, Section 844(f)(1); (2)

one count of attempting to damage and destroy, by means of fire and an explosive, a building used in interstate commerce and in an activity affecting interstate commerce, in violation of Title 18, United States Code, Section 844(i); (3) one count of attempting to provide material support and resources intending that they be used in preparation for and in carrying out a violation of Title 18, United States Code, Sections 844(f), 844(i), and 1114, in violation of Title 18, United States Code, Sections 2339A; (4) one count of fraudulently making, forging and counterfeiting U.S. Federal Reserve Notes, in violation of Title 18, United States Code, Section 471; and (5) five counts of selling, exchanging, transferring and delivering false, forged, counterfeited and altered U.S. Federal Reserve Notes, with the intent that the same be passed, published and used as true and genuine, in violation of Title 18, United States Code, Section 473.

## ARGUMENT

### I.    The Court Should Require Defendant To Present A Pre-Trial Proffer Of Any Evidence He Intends To Introduce In Support Of His Entrapment Defense

The government anticipates that defense counsel may raise an entrapment defense at trial. Given the overwhelming evidence that shows that defendant was not entrapped, and so that the Court can determine whether his presentation of the defense to the jury would be proper, the government asks the Court to require defendant to present a pre-trial proffer of evidence that he intends to introduce that would support his entrapment defense. As the Seventh Circuit has explained, "there exists substantial legal authority" in support of a court requiring a defendant to make a sufficient proffer of entrapment evidence before presenting such a defense to the jury. *United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999).

The affirmative defense of entrapment requires proof by defendant of two elements: "'[1]

11

government inducement of the crime, and [2] a lack of predisposition on the part of the defendant to engage in criminal conduct.'" *Blassingame*, 197 F.3d at 279-280 (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1998)); *see also United States v. Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993). The defendant's burden is to establish more than a scintilla of evidence, although the evidence need not be so substantial that, if uncontroverted, it supports a finding of entrapment as a matter of law. *Blassingame*, 197 F.3d at 280. If the defendant adequately establishes both elements of entrapment, the burden shifts to the government, which can rebut the entrapment defense by proving beyond a reasonable doubt either the absence of government inducement *or* the defendant's predisposition to commit the offense. *Id.*

Presumably, defendant intends to introduce evidence or elicit testimony during trial that suggests he was not predisposed to commit the crime prior to his communications with CW2, UC1, and UC2 in this case. Such evidence or testimony should not be admissible absent a pre-trial evidentiary proffer that meets the defendant's burden to establish entrapment.

As an initial matter, it is settled law in this circuit that "[m]otions *in limine* are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002); *see also Blassingame*, 197 F.3d at 279. Further, as the Supreme Court has held,

> The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with

testimony supporting other elements of the defense.

*United States v. Bailey*, 444 U.S. 394, 416 (1980). This is exactly the case here, where it appears that defendant will not be able to meet his burden of production with respect to the predisposition element of the entrapment defense. There is no need to burden and confuse the jury with testimony related to the other elements of the defense. Accordingly, the Court should require a pre-trial proffer of such evidence.

**II.     Defendant Will Be Unable To Make A *Prima Facie* Showing That He Lacked The Predisposition To Attempt To Damage And Destroy The Dirksen Federal Building, As Charged In Counts One And Two.**

This Court should exclude any argument or evidence concerning entrapment because such a defense is not available as a matter of law, given the facts of this case. Absence of predisposition is the principal element of the defendant's initial burden of the entrapment defense. *Blassingame*, 197 F.3d at 280. The predisposition inquiry "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to commit the crime." *Id.* at 280-81 (quoting *Mathews*, 485 U.S. at 63). The facts show here that defendant falls into the category of an unwary criminal.

A predisposed person is one "who takes advantage of an ordinary opportunity to commit criminal acts – not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person . . . ." *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). In determining whether a defendant was (or was not) predisposed to commit a crime, the following factors are relevant: (1) the defendant's character or reputation, including prior criminal history; (2) whether law enforcement officers initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether defendant showed a reluctance to commit the offense that

13

was overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *United States v. Higham*, 98 F.3d 285, 291 (7th Cir. 1996). These entrapment factors show that defendant cannot, as a matter of law, make a *prima facie* showing of lack of predisposition.

### A. The Defendant's Character and Reputation Show he has a Predisposition to Commit the Crimes Charged

Defendant has an extremely lengthy criminal history. It is filled with violent felony convictions, which show that he has a predisposition to use weapons and attempt murder.

On August 27, 1972, defendant was arrested for attempted murder, armed robbery, and aggravated assault in Illinois. He pled guilty to all three counts and was sentenced to concurrent terms of seven years to seven years and one day on the attempted murder and armed robbery convictions, as well as a concurrent term of one to five years on the aggravated assault conviction.

On September 21, 1976, defendant was charged with burglary and armed robbery in Illinois. He was convicted and sentenced to a six to eighteen year sentence on the burglary and a thirty to fifty year sentence on the armed robbery on October 12, 1977. Defendant was first released on parole on January 23, 1998 before violating his parole and spending from October 25 to November 17, 2000 in prison. These convictions clearly show he has a predisposition to commit violent offenses. Although these are old convictions, their age is mitigated by the fact that defendant spent a vast majority of the years between 1972 and today in prison.

Specifically regarding the counterfeiting charges in Counts Four through Nine, defendant was charged in October 24, 2000 with manufacturing counterfeit currency. He was ultimately convicted and sentenced to 24 months on September 5, 2002. This conviction shows his predisposition to

14

counterfeit money.

**B.    Defendant Suggested the Criminal Activity**

With respect to Counts One and Two, the government is prepared to present the testimony of CW1 to rebut the entrapment defense. The government expects CW1 to state that defendant told him about defendant's plans to bomb the Dirksen Federal Building while they were inmates together, but before CW1 had been in contact with law enforcement. The government also expects CW1 to state that defendant drew a diagram of the Dirksen Federal Building in the sand while describing his plan. The government further expects CW1 to testify that after informing the FBI of defendant's plan, he provided (at the FBI's suggestion) defendant with an undercover telephone number for the FBI.

On November 13, 14, and 25, 2003, defendant placed telephone calls to the undercover FBI number. It was only after this third call that an undercover FBI agent called defendant back. During the ensuing call, defendant identified himself as "Ben Laden" – an obvious reference to the leader of Al Qaeda. He would continue to go by the name "Ben" throughout his dealings with UC1.

As to Count Three, defendant inquired of CW2's knowledge of any associates of Hamas or Al Qaeda without any provocation from CW2. He mentioned that these groups were rich with oil money. It was defendant's idea to sell ammonium nitrate fertilizer to a member of Hamas or Al Qaeda to enrich himself.

Regarding Counts Four through Nine, in addition to defendant's prior counterfeiting conviction, the evidence will be that defendant told UC1 immediately after meeting him that he was into "graphic arts" and that he "made money the old fashioned way . . . as in printing it." Defendant asked UC1 if he "could use some bogus money." Defendant spent a large part of the next few

months putting himself in position to print counterfeit money. *See United States v. McGrath*, 494 F.2d 562 (7th Cir. 1974) (entrapment defense not available where defendant came up with scheme to print counterfeit currency, purchased paper and ink, and made inquiries about a printer, despite government agents arranging for and supervising the actual printing of the counterfeit bills, and determining how and when they would be delivered to defendant).

## C.    Defendant Engaged in the Criminal Activity for Profit

Defendant attempted to make sure that his acquisition and sale of the fertilizer was profitable. He bought two tons of it from UC1 for $9,000 in counterfeit bills. He turned around and sold a portion of the fertilizer to UC2 for $10,000 in legitimate bills. He even attempted to cheat UC1 by telling him that UC2 was to purchase the fertilizer for $5,000 (instead of $10,000) and offering him $3,000 for providing defendant with the fertilizer. Defendant's overall exchange with UC1 was going to allow him to keep half a ton of the fertilizer for himself (to attack the Dirksen Federal Building) and take a $7,000 profit from his deal with UC2. The only thing he provided in return was $9,000 in counterfeit bills to UC2.[1] The transactions were therefore a windfall to defendant.

With respect to the counterfeiting charges, the manufacture and sale of the bills was clearly profitable to defendant. In four separate transactions, he provided CW2 with a total of $58,040 of counterfeit bills in exchange for $11,100 in U.S. Currency. He provided $5,000 to CW2 for her work to broker the deal. All told, he netted $6,100 for his counterfeiting work.

Even outside of the financial aspect of the offenses, defendant had a clear motive for his crimes charged in Counts One and Two. He was extremely angry at the federal government, the

---

[1] According to defendant's own words, $9,000 in counterfeit bills normally would net him twenty to thirty percent of the face value of the bills (which would amount to $1,800 to $2,700 in legitimate funds).

federal court system, and the district court judge in his counterfeiting case.

### D.    Defendant Did Not Show a Reluctance to Commit the Offense

Law enforcement recorded tens of hours worth of conversations that UC1, UC2, CW1, and CW2 had with defendant. With the exception of some hesitancy he expressed because he did not trust UC2 initially, defendant did not show a reluctance to commit any offense.

### E.    The Nature of Law Enforcement's Inducement Does Not Support an Entrapment Defense

Defendant was the individual who came up with the ideas for his criminal conduct. The federal agents listened to defendant, provided assistance to defendant when he needed it, and purchased items from defendant when he offered. While law enforcement was in contact with defendant often during a several month period, defendant showed that he was the brains of the criminal activity and the one running the show.

Any profits that defendant made were a result of his dealings and suggestions. Defendant was the one who attempted to get a member of Al Qaeda or Hamas to purchase fertilizer from him in order to make a profit. Defendant initially suggested $15,000 for the half-ton. He later agreed to a figure of $10,000. With respect to his counterfeiting, defendant set the price of twenty to thirty percent of the total face-value of the counterfeit bills. Defendant wound up taking less than twenty percent on the bills that he sold to the purported friend of CW2. In fact, including the money he gave to CW2 as her share of the transaction, defendant received less than ten-percent of the face-value of the counterfeit bills.[2] Accordingly, this factor does not support an entrapment defense.

---

[2] Further, even if this Court were to find that law enforcement did repeatedly induce or persuade defendant to perform criminal activity, the Seventh Circuit recognizes that the "government's persistence in attempting to set up" criminal activity "is not alone sufficient to carry the case beyond an ordinary opportunity." *Santiago-Godinez*, 12 F.3d at 729.

Because these factors show that defendant is unable to produce evidence that he was not predisposed to commit the offenses charged in the indictment, this Court should bar defendant from raising an entrapment defense at trial.

## III. If The Court Allows Defendant To Proceed With An Entrapment Defense, Defendant's Prior Crimes Of Violence And Counterfeiting Should Be Admissible.

Defendant's prior criminal acts are admissible if they "prove predisposition in an entrapment case, because in such a case the defendant's predisposition to commit the charged crime is legitimately at issue." *United States v. Bastanipour*, 41 F.3d 1178, 1183 (7th Cir. 1994); *see also Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932) ("if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue."). If the defendant is allowed to proceed with an entrapment defense, the government seeks an *in limine* ruling that Federal Rule of Evidence 404(b) allows the admission of the following category of defendant's convictions: (1) defendant's prior crimes of violence and (2) defendant's prior counterfeiting conviction.

### A. Defendant's Prior Violent Offenses are Admissible

On August 27, 1972, defendant was arrested for attempted murder, armed robbery, and aggravated assault. He pled guilty to all three counts and was sentenced to concurrent terms of seven years to seven years and one day on the attempted murder and armed robbery convictions, as well as a concurrent term of one to five years on the aggravated assault conviction.

On September 21, 1976, defendant was charged with burglary and armed robbery in Illinois. He was convicted and sentenced to a six to eighteen year sentence on the burglary and a thirty to fifty year sentence on the armed robbery on October 12, 1977. Defendant was first released on parole on

January 23, 1998 before violating his parole and spending from October 25 to November 17, 2000 in prison.

These convictions show defendant's predisposition to commit violent offenses and are admissible if defendant is able to assert an entrapment defense. *Higham*, 98 F.3d at 292 (where defendant was charged with a murder-for-hire scheme, government had right to meet defendant's claim of entrapment with evidence of other violent acts). Although these are obviously old convictions, defendant has spent almost all of the years between the 1972 arrest and today's date in prison due to these charges.[3] These convictions make it clear that when defendant is out on the street, he has a predisposition to commit violent acts.

**B.     Defendant's Counterfeiting Conviction is Admissible Regardless of whether Defendant Can Put Forth an Entrapment Defense**

The government previously gave notice of its intent to use evidence related to defendant's counterfeiting conviction, as it explains his motive for his plan to attack the Dirksen Federal Building and to provide support to Al Qaeda. Defendant expressed his anger at the presiding judge in that case, as well as his frustration with the whole federal system, as a result of his conviction.

Specifically related to the counterfeiting charges in Counts Four through Nine, the conviction also shows his predisposition to counterfeit money. Given that he was manufacturing counterfeit bills only a few years before the current counterfeiting activity, the evidence is highly probative to show his predisposition to commit the counterfeiting offenses. As with the instant charges, his

---

[3] Although the government does not seek introduction of these convictions through Rule 609, the 1977 conviction would be timely under Rule 609(b) because a period of more than ten years has not elapsed since the date of his release from the confinement imposed for that conviction.

previous offense involved use of a home computer to print the counterfeit bills. This demonstrates defendant's knowledge of computers and *modus operandi*. This evidence is highly probative evidence and is not unfairly prejudicial.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court bar any entrapment defense in the absence of a sufficient pre-trial evidentiary proffer. Alternatively, if the Court allows defendant to argue entrapment, the government asks this Court to find that defendant's prior convictions described above are admissible evidence.

Respectfully Submitted,
PATRICK J. FITZGERALD
United States Attorney

By:

BRANDON D. FOX
VICTORIA J. PETERS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300