**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AUG 2 3 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

Plaintiff,

v.

GALE NETTLES,

Defendant.

04 CR 699

Honorable John F. Keenan

## NOTICE OF FILING

TO:    John C. Kocoras
       Assistant United States Attorney
       219 South Dearborn Street
       Suite 500
       Chicago, IL 60604

**PLEASE TAKE NOTICE THAT** on the 23rd day of August, 2005, we caused to be filed with the Clerk of the United States, District Court for the Northern District of Illinois:

**DEFENDANT'S RESPONSE TO GOVERNMENT'S
MOTION *IN LIMINE* TO EXCLUDE ENTRAPMENT DEFENSE**

Respectfully submitted,

JOHN T. THEIS

JOHN T. THEIS
Attorney for Defendant
29 S. LaSalle Street, Suite 200
Chicago, Illinois 60603
(312) 782-1121

## CERTIFIED PROOF OF SERVICE

The undersigned, Judith Cavazos, a non-attorney, served a true and accurate copy of the foregoing Notice and attached document by hand delivery to the parties as addressed above on August 23, 2005.

JUDITH CAVAZOS

F.\Clancy\AATHEIS\2004\Nettles\notoffil002.wpd

KC **F I L E D**

AUG 2 3 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

GALE NETTLES,

Defendant.

04 CR 699

Honorable John F. Keenan

## DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE ENTRAPMENT DEFENSE

NOW COMES the Defendant, GALE NETTLES, by and through his attorney, JOHN T. THEIS, and responds to the Government's Motion *in Limine* to exclude an entrapment defense in this case.

### BACKGROUND

The Defendant, Gale Nettles, is charged in this indictment with nine counts, of which three relate to an alleged attempt to damage or destroy the Federal Courthouse in Chicago, and the remaining six relate to alleged efforts to pass counterfeit United States currency. Trial is set to begin in this case on September 6, 2005, and on August 15, 2005, the Government filed a motion entitled "Government's Motion *in Limine* to Exclude an Entrapment Defense." This Court ordered on August 16, 2005, that Defendant file a response to the Government's motion. For the reasons stated herein, the Defendant respectfully requests that this Court deny the Government's Motion *in Limine* as well as its request for alternative relief.

### LAW

At the outset, the Defendant objects to the Government's request that he set forth his

1

defense and evidence in support of it prior to trial. This attempt to require the Defendant to have his defense pre-screened by the Court is in violation not only of the Due Process clause of the United States Constitution because of the shifting of the burden, but has a chilling effect on the Defendant's presentation of his defense.

It is the Defendant's position that the Defendant merely must show that a proposed defense is one recognized by the law. The Government concedes that entrapment is a legally recognized defense, as indeed it must. *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed. 2nd 174 (1992); *Matthews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed. 2nd 54 (1988).

The Defendant is not seeking to argue to the jury that the law prohibits conviction on some frivolous basis that is not recognized by the law. This the Defendant clearly could not do. As in any criminal case, the Defendant has the right to pursue by opening statement, cross-examination, and presentation of evidence, any defense that he may. If he fails in that effort, the jurors can reject that defense. If defense counsel tells the jurors in opening statement that he expects the evidence to show something which the evidence does not later support, he does so at his peril, since the jurors are likely if not certain to reject that defense.

The Government's request is an unusual one which the Court should view very skeptically, as it goes to the heart of the Defendant's most basic fundamental right, that of a trial by jury. The Government is stating in effect that it does not trust the jurors to sort out the evidence and reach its conclusion based on the law as presented by the Court.

The cases cited by the Government in support of its novel request confuse the issue of whether the Defendant has sufficiently shown, during the trial grounds, to support an entrapment

2

instruction, and a pre-trial denial of the Defendant's right to present a defense. As the Court

stated in *United States v. Fadel*, 84 F. 2nd 1425 (10th Cir. 1988), the "issue of whether there is a

factual dispute relating to entrapment sufficient to submit the issue to the jury typically arises at

the conclusion of the trial, when a district judge must decide if adequate evidence has been

presented to warrant an entrapment instruction." *See, e.g., United States v. Ortiz*, 804 F. 2nd at

1163; *United States v. Fleishman*, 684 F. 2nd 1329, 1342-43 (9th Cir.) *cert denied*, 459 U.S. 1044,

103 S.Ct. 464, 74 L.Ed. 2nd 614 (1982); *United States v. Gurule*, 522 F. 2nd 20, 23 (10th Cir.

1975); *Martinez v. United States*, 373 F. 2nd at 811-12. The *Fadel* Court discussed the degree of

proof required to submit the entrapment defense to the jury, and concluded that the test is

"whether the evidence, regardless of the amount, creates a factual issue."

The Court in *Fadel* added, "what is less clear is the degree of discretion accorded to Trial

Courts to hear and resolve entrapment motions *prior* to trial. The vast majorities of Courts which

have considered the issue have not favored the pre-trial resolution of entrapment defense

motions. (Citations omitted)" The Court added, "The reasons for such a preference are grounded

in the fact that the defense of entrapment is intertwined with the issue of intent and is typically

based on credibility determinations, an area traditionally reserved for jury resolution. (Citations

omitted) The District Courts are also understandably reluctant to hold, prior to trial, 'mini trials'

devoted to the issues of intent and inducement complete with dress rehearsals of the trial

testimony of Government informants and investigative agents. *United States v. Killough*, 607

F.Sup. at 1011."

In *United States v. Gurolla*, 333 F. 3d 944 (9th Cir. 2003), the Court of Appeals reversed

the Defendant's conviction because the District Court precluded the Defendant from using the

3

entrapment defense. As the Court stated, the Defendant's "entrapment defense was not strong. However, as we have stated, only 'slight evidence' entitles a Defendant to present his defense to the jury. *United States v. Becerra*, 992 F. 2nd 930 (9th Cir. 1993). (The Defendant) presented 'slight evidence' on both elements of the entrapment defense. The weight and credibility of that evidence were matters for the jury to determine. Accordingly, we must reverse (the Defendant's) conviction. On retrial he shall be permitted to present an entrapment defense." 333 F. 3rd at 956.

Even in one of the cases cited by the Government, *United States v. Santiago-Godinez*, 12 F. 3rd 722 (7th Cir. 1993), the Court conceded that

> "the issue of whether there is sufficient evidence of entrapment to support submission of that defense to a jury typically arises after the evidence has been received at trial. 'Unless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused.' *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed. 2nd 848 (1958). So, generally the question of entrapment is one for the jury rather than for the Court. *Matthews, supra*. And whether or not an entrapment defense is available to a defendant is not amenable to pre-trial resolution. This is because whether entrapment occurred is a factual issue; the defense of which is intertwined with the issue of intent and is often based on credibility determinations, which are traditionally reserved for jury resolution. (Citations omitted)"

Notwithstanding the clear preference for resolving the issue of whether sufficient evidence has been presented on the entrapment defense at the time of instructions, and not in a pre-trial motion *in limine*, the Government has cited *United States v. Blassingame*, 197 F. 3rd 271 (7th Cir. 1999) as authority for its request here. *Blassingame* is easily distinguishable and does not support the Government's request. In *Blassingame*, the Government filed a motion *in limine* to bar the Defendant Thomas Fuller from presenting an entrapment defense at trial. The

4

Government argued the defense could not set forth sufficient *prima facie* evidence to demonstrate a viable entrapment defense, and in that case the Defendant declined to make a proffer of his entrapment evidence. (The Defendant in this case understands Defendant Fuller's reluctance to do what the law had not previously required, but in light of the Seventh Circuit's holding in *Blassingame*, the Defendant presents as part of this motion a summary of facts which would support the entrapment defense.)

The Court cited *United States v. Teague*, 956 F 2nd 1427 (7th Cir. 1992) and *United States v. Carrasco*, 887 F. 2nd 794 (7th Cir. 1989) and held that those cases required Defendant to present as a prerequisite for presenting his defense for entrapment sufficient evidence upon which a rational jury could have inferred that the Defendant was entrapped into committing the crime charged. *Teague* clearly was a case in which the issue was whether the instruction should be given, and not whether a pre-trial proffer should be required. In *Carrasco*, it is unclear whether any pre-trial proffer was required by the Court, but in any case, the Court merely found that the Defendant was not entrapped as a matter of law. From these cases, the *Blassingame* Court found that it was not error for the Trial Court to bar the entrapment defense from Defendant Fuller's opening statement. The opinion thus blurs the distinction between a pre-trial proffer, a sufficient showing to receive a jury instruction on the issue, and a finding of entrapment as a matter of law. Given the strong preference asserted by the cases cited above for allowing a defendant to introduce evidence to support his defense to a jury, it is wrong to assume that *Blassingame* stands for the proposition that the Defendant should be precluded from any effort to develop a legally recognized defense.

Finally, the Government has asked in the alternative that the Defendant's prior criminal

history be introduced. This Court has already ruled on Defendant's Motion *in Limine* to prohibit introduction of evidence of his prior counterfeiting conviction, and stated that the Government can do so, within limitations. However, the Defendant's prior convictions from before 1980 which involved totally unrelated acts which the Government now asserts are evidence of a predisposition for violence, would be highly improper. The Government has no evidence other than the uncorroborated assertion of a convicted felon with whom Defendant spoke in the Bureau of Prisons facility in Yazoo City, Mississippi to establish its predisposition, and therefore they want to introduce highly prejudicial evidence of unrelated acts, which are remote in time and of little probative value. This Court should deny their request.

## FACTS

The Government has set forth in its motion *in limine* in this case a summary of what they expect the evidence to show in their case in chief. Although much of the information contained in the Government's synopsis will be unchallenged at trial, a significant part of it is subject to the credibility analysis which is inherent in any criminal trial. Included in that body of disputed evidence is critical testimony on the issue of entrapment, on both issues that the Defendant must prove to support his defense: Government inducement of the crime, and lack of predisposition on the part of the Defendant to engage in the criminal conduct alleged.

Even the Government's proffer concedes that the initial discussions which they expect to introduce at trial were between Defendant and an individual identified as CW1, whom the Government points out is a convicted felon serving time at a Federal Correction Institute in Yazoo City, Mississippi. Defendant expects to challenge the substance and nature of the conversations set forth in the Government's proffer, but even the witness has told law

6

enforcement that he was not sure that the conversations which the Government summarizes were serious discussions evidencing an intent to commit a crime. The Defendant reaches that conclusion based on summaries of the witness's statements contained in discovery in this case.

Nevertheless, the Government's informant spoke to FBI agents who began a series of acts and efforts to induce the Defendant to engage in the conduct alleged in the indictment. Without asking the Court to engage in the type of "mini trial" which the case law asserts the Court should avoid, the Defendant merely asserts that he expects the evidence will show, based on what he has learned to this point, that the Government overreached in its efforts to encourage the Defendant to commit a criminal act which toward which he was not predisposed. An example of the conversations, and who initiated them, is contained as an appendix herein. In general, the Defendant expects to show the following which he believes will be sufficient to support an entrapment instruction at the end of the case, if not a directed finding on the issue of entrapment as a matter of law:

A. The vast majority of the conversations between undercover law enforcement agencies were initiated by law enforcement. On most of these, the Defendant merely responded to the agents' calls, and almost always "put them off" by telling them that he was not ready to do any of the acts, particularly in the area of explosive devices, that the Government was pushing him to do.

B. When the undercover agent called Defendant, as the Government asserts, to discuss the criminal acts, the Defendant asked the undercover agent to explain what it was that the agent wanted him to do. Defendant in that conversation told the agent he would call him back later. The Government contacted the Defendant again less than two weeks later, and the Defendant again did not initiate any conversations concerning illegal activity, but told him he was not ready to do any such thing.

C. A week later, the Government called Defendant again, and the discussion concerned criminal activity, but the Government had already initiated the

7

discussions, and the Defendant, who had recently been released from a halfway house following his federal sentence, was nearly destitute and in the process of obtaining a single room occupancy hotel room. Defendant was not in a position to commit any of the charged criminal acts.

D.   Despite the Defendant's penurious state, the Government encouraged him to commit criminal acts by providing him with a printer and software to engage in counterfeiting.

E.   In April 2004, when the Defendant had not sufficiently responded to the Government's entreaties, the Government introduced another individual to Defendant, who was a paid cooperating individual, a woman significantly younger than the Defendant who met with him on a regular basis and engage in friendly conversations with him in an effort to ingratiate herself with the Defendant. These conversations were lengthy, numerous and indicative of the Government's efforts to encourage an unwitting and unwilling individual to participate in criminal acts.

F.   The undercover cooperating witness told the Defendant that she had a friend who was interested in counterfeit currency, and she provided him with paper to be used in counterfeiting.

G.   The Government also provided the Defendant with the purported ammonium nitrate, which the Defendant was expected to sell to another individual (who turned out to be an FBI agent acting undercover himself). In other words, the Government provided the criminal means, the introduction was made by a Government cooperating witness and buyer was an FBI agent. The Government even provided the means for the Defendant to pay for the purported ammonium nitrate.

H.   The ammonium nitrate purchase itself was the subject of overbearing, strongly worded efforts by the Government agent to push the Defendant to commit a criminal act. The Defendant repeatedly told the agents that he was not ready to do any such thing, and the Government called him repeatedly, and pushed him by saying that the purchase had to be done soon because the Government agent was no longer going to have access to it.

The Government thus initiated the contact, provided the supposed explosive device,

provided a purchaser, repeatedly contacted the Defendant when the Defendant would go weeks

without making any effort to contact them, and when he was not sufficiently responsive to their

requests, sent a young woman in to further entice him into criminal behavior. The Court may or may not conclude when it has heard all the evidence in this case that the above facts establish entrapment as a matter of law. The Court will also be asked to make a decision at the close of evidence as to whether the Defendant is entitled to an instruction on his entrapment defense, and the Court will be asked to make that decision at that proper time. However, what this Court should not do is deny the Defendant the right to pursue a defense which is well established in law, as that would in effect deny him his right to have a jury consider whether the Government has proved its case or whether the Defendant has successfully met his burden to establish entrapment.

Respectfully submitted,

_____
JOHN T. THEIS

John T. Theis
29 South La Salle Street
Barrister Hall - Suite 220
Chicago, IL 60603
(312) 782-1121

F:\Clancy\AATHEIS\2004\Nettles\responselimineentrapment.wpd

## APPENDIX

## (EXCERPTS FROM DRAFT TRANSCRIPTS)

Date: 12/01/2003

SPEAKERS:

UCE1-        Gary

NETTLES-     Gale William Nettles

Nettles:     Hello.

UCE1:        Benny.

Nettles:     (UI) Hello.

UCE1:        Benny.

****

UCE1:        This is Gary from Louisiana.

Nettles:     Gary from Louisiana, yeah what's going on?

UCE1:        Hi man, how you doing?

Nettles:     Oh pretty fair.

UCE1:        Uh, just back in and a guy who works for me, told me you called, wanted me to

             call you.

Date: 1/14/02004

SPEAKERS:

NETTLES-     Gale William Nettles

UCE1-        Gary

Nettles:     I'm into graphic art.

****

Nettles:     I usually make my money the old fashioned way.

UCE1:        As in...

Nettles:     As in printing it.

UCE1:        I gotcha.

UCE1:        My, my understanding from his is you needed some fertilizer, is that right?

Nettles:     Mmm.

Nettles:     Yeah (UI) project (UI).

UCE1:        Well that's the project I'm here about obviously. I don't know anything about the other part.

*******************************************************************************

UCE1:        Do you have any ah, what I am tryin' to say. Do you have any experience with that kind of thing?

Nettles:     Mmmm, a little.

UCE1:        How much is a little I mean give me a, an idea.

Nettles:     I know how to put it together.

UCE1:        The reason I'm askin' I use it from time-to-time on the farm blowing beaver damns and stumps and stuff instead of havin' to buy commercial explosives to do it. You know a two liter coke bottle and that stuff and make your own. I just, I didn't know if you knew how to mix it or how to whatever.

Nettles:     1/3 liquid and 2/3 of (UI) right?

UCE1:        Yeah basically.

Nettles:      (UI).

UCE1:      Yeah, that's right. It's ah, that's exactly right. It's like a fourth to a third of ah, diesel or kerosene and then the rest fertilizer. But you got... have you ever shot any of it before?

Nettles:      Just dynamite.

UCE1:      You realize ah, with the ammonia mix up it makes damn good bomb. But you got to have, you got to have booster you gotta have somethin' to set it off with. You realize that?

Date: 1/19/2004

SPEAKERS:

Nettles-      Gale William Nettles

UCE1-      Gary

Nettles:      Hello?

UCE1:      Benny?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UCE1:      Huh, okay. Well, it rained down here, so I'm on hold for a little while from my f...(cough) excuse me, from my farming. You still, we still gon' take care of this deal?

\*\*\*\*

\*\*\*\*

Nettles:      Said it'll be a few days. I'm still tryin' to get in touch with some people.

Date: 1/26/2004

SPEAKERS:

UCE1-        Gary

Nettles-        Gale William Nettles

UCE1:        Yeah. What's been going on, man? I haven't heard from you.

****

UCE1:        I called.

Date: 4/20/2004

SPEAKERS:

CW2-        Maria

Nettles-        Gale William Nettles

CW2: I left you messages for you to call me. I haven't heard from you. I thought something

happened to you.

Nettles:        Nah. Yeah sometimes I check my voicemail. Sometimes I don't. (UI).

*******************************************************************************

CW2:        (LAUGHS). Oh, pops, pops. So what you have to tell me today, nothing? What

you...

****

CW2:        ...been doing with yourself all this time? God, we haven't talked for about what a

week. Right pops?

*******************************************************************************

Nettles:        I haven't checked my, I haven't checked my voice mail yet. I, I came in the room

I didn't have the phone and I noticed there was a, uh, I had one mess-message on

my screen. One missed call.

****

Nettles:     So that was you that called?

CW2:         Yep it was me who called you then.  Okay. So what's up at Humboldt Park?  And what, was going on there?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:         Okay see well that's why I'm telling you.  You know?  You said you need a partner.  I'm here.  I, I don't know what you're gonna, what you wanna do.  If I can help you we can make money for the both of us.  Hwy, what are we waiting for?  I told you I can use a couple hundred dollars here and there.  Right, I told you?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:         Well, that's why you have to tell me.  So in order for us to work together, it comes out right for the both of us.  Right?

Nettles:     Yeah, we'll see.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:         But don't forget to call me cause I'll be expecting your phone call.

\*\*\*\*

CW2:         You always say you're gonna call me and you never call me.  And you leave me hanging.  And I'm waiting for you to call so I gotta call you cause you don't call me.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:         You don't wanna get together?  Maybe we can have lunch at your new snack place or something?

Nettles:     Uh, I don't, I'll have, I'll have to wait and see.  Because, uh, I'd like to see, uh,

I'm on the trail of paper and uh.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:       Well what other else do you need?  What else do you need?  That water paper?

           What else?

Nettles:   (UI) uh.

Date: 4/24/2004

SPEAKERS:

CW2-       Maria

Nettles-   Gale William Nettles

UM-        Unknown Male

UF-        Unknown Female

CW2:       Hey pops.  Hey pops, don't you hear me calling you?  (LAUGHS).  Don't you

           hear me calling you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:       And I called you back twice and your answering machine just picked up.  You

           didn't get my message?

\*\*\*\*

CW2:       Why didn't you call me?  I thought something happened to you.

\*\*\*\*

CW2:       Well you should have called me I was worried.

Date: 4/28/2004

SPEAKERS:

CW2-       Maria

Nettles-      Gale William Nettles

UM-      Unknown Male

UM#2-      Unknown Male #2

Nettles:      I don't know.  I need to go back out and jack my bank up again.

CW2:      Ew, can I go with you?  I need some money too.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CW2:      Yep.  Oh, lets see.  I have to tell you pops. You give me a call tonight or what?

\*\*\*\*

\*\*\*\*

Nettles:      I'm trying to see Bob (UI) that's my first objective.

Date: 5/13/2004

SPEAKERS:

Nettles-      Gale William Nettles

CW2-      Maria

CW2:      (LAUGHTER) Hey pops?

\*\*\*\*

CW2:      I was wondering if you want, if we could...

\*\*\*\*

\*\*\*\*

CW2:      I was wondering if we could meet tomorrow.

Date: 5/22/2004

SPEAKERS:

CW2-      Maria

Nettles-    Gale William Nettles

Nettles:    Hello.

CW2:        Hey pops.

Date: 5/22/2004

SPEAKERS:

CW2-        Maria

Nettles-    Gale Williams Nettles

Nettles:    Hello?

CW2:        (UI).

Nettles:    Hello?

CW2:        Hello?

Nettles:    Yeah, can you hear me know?

CW2:        Yeah, I can hear you.  I just got out of the shower.

Date: 5/22/04

SPEAKERS:

CW2-        Maria

Nettles-    Gale William Nettles

UM-         Unknown Male

CW2:        When do you wanna meet so that I can bring you the money?

Nettles:    Ah, whenever's convenient for you.

Date: 6/06/2004

SPEAKERS:

Nettles-    Gale William Nettles

CW2-        Maria

AVMS-       Automatic Voice Message System

CW2:        Hey pops, it's me Maria thought I'd call you see what you were up to. Be trying

to get a hold of you, but I guess you're a hard man to get a hold of. Give me a call

as soon as you get this message. Bye.

Date: 6/10/2004

SPEAKERS:

Nettles-    Gale William Nettles

UCE1-       Gary

UCE1:       Yeah that sounds good. Anyways alright, I haven't heard from you, you said you

was gone call me back in a week and I was just wonderin'.

Date: 6/20/2004

SPEAKERS:

Nettles-    Gale William Nettles

UCE1-       Gary

UCE1:       Hello.

Nettles:    Hello. Hello.

UCE1:       Hey Benny what's up man?

Nettles:    Huh?

UCE1:       I said hey Benny what's up?

Nettles:    Yeah (UI) if I get work.

UCE1:       Mm hm.

Nettles:    (UI) like that. Can, can you hear me okay now?

UCE1:     Sure. Sounds good. How you been man?

Nettles:  Ah, things been goin' slow. And (UI). I got everything ah, but the paper. (UI) a

          lot of (UI) tryin' to find something here.

Date: 6/27/2004

SPEAKERS:

Nettles-  Gale William Nettles

AVMS-     Automatic Voice Message System


Nettles:  Hello Gary, this is me Benny in Chicago. I got your voice mail message that I

          haven't called you because I've been in the hospital, pressure sk- shot sky high on

          me. I had an operation (UI), you go into the hospital, and uh, the doctor (UI) I

          probably gotta go back for another operation probably in a month, month a half.

          Um, I , it'll be a few days before I can do anything. I haven't forgotten. Take

          care.

Date: 6/27/2004

SPEAKERS:

UCE1-     Gary

Nettles-  Gale William Nettles

UCE1:     I gotcha', okay alright. I didn't know I hadn't heard from you.

Nettles:  Right, I got your, I got your voice mail message. I came back and got a whole

          bunch of misses, missed calls wound up on my phone.

\*\*\*\*

\*\*\*\*

UCE1: Well, I know you got a little bit laying around. I just want you to mail me one, I just want to look at. I don't care if its not the best in the world I just wanted to look at it.

Nettles: Nay, I don't have any laying around. It's a little to dangerous to keep around.

Date: 7/06/2004

SPEAKERS:

Nettles- Gale William Nettles

CW2- Maria

Nettles: Hello.

CW2: Hey pops.

Nettles: Yeah, I hear you.

CW2: Um, okay can we set something up either for tomorrow, or for Thursday uh but it had to be like um, like um around 8:30- 9:00 in the morning.

Date:7/19/2004

SPEAKERS:

UCE1- Gary

Nettles- Gale William Nettles

AVMS- Automatic Voice Message System

Nettles: Hey, you helped me out, that's a sample. Whatever you want to do with it.

UCE1: Well, I mean if it's, if it's passable I'll take that as payment for thee (sic) uh, fertilizer. How 'bout that?

Nettles: Well I was thinkin' more like you sent me some software and a printer and so forth and uh, it's uh, I still gotta get a little cash together. I'm I'm I make some

going you know to Mexico, but I think that one is pretty much dead for about six months now. (Chuckles).

Date: 7/21/2004

SPEAKERS:

Nettles-        Gale William Nettles

UCE1-        Gary

Nettles:        Hello.

UCE1:        Benny?

Nettles:        Hello.

UCE1        Benny?

Nettles:        Yeah.

UCE1:        Hey man, what's up?

Date: 7/26/2004

SPEAKERS:

UCE1-        Gary

Nettles-        Gale William Nettles

Nettles:        Hello.

UCE1:        Hey man, what's up?

Date: 7/29/2004

SPEAKERS:

Nettles-        Gale William Nettles

UCE1-        Gary

Nettles:        Hello.

UCE1:      Benny.  Benny?

Nettles:   Yeah.

UCE1:      Hey man, what's up?

Nettles:   Eh, nothing much.

UCE1:      I've been looking to hear from you, I haven't heard, what's up?

Date: 8/01/2004

SPEAKERS:

Nettles-   Gale William Nettles

AVMS-      Automatic Voice Message System

UCE1-      Gary

Nettles:   Hello Gary, this is uh Ben in Chicago uh something aint right in (UI) so let's put uh, say we could put a hold on any movement.  And if you, (UI) I have another phone on it that's totally clean, Im using it uh.  The phone number on it is (773) 518-9424.  Take care.

(PHONE RINGING)

Nettles:   Hello.

UCE1:      Hey man what's up?

Nettles:   I don't know, things getting a little screwy up here.  This guy that I was talking to.

****

Nettles:   He was uh, he was uh trying to ask too many questions.

UCE1:      Like what?

Nettles:   Uh, the ones that going to be additional.

UCE1:      Yeah, yeah well piss on him don't play with him no more.

Nettles: Yeah, I'm not, but uhm I'm a little leery about moving anything in (UI) tomorrow because uh I don't know, things, things, (UI) this guy, I didn't feel right talking to him this time.

Date: 8/01/2004

SPEAKERS:

CW2- Maria

AVMS- Automatic Voice Message System

CW2: Hey pops it's me Maria. Give me a call right away or right back okay. Bye.